IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CAMPBELL SALES GROUP, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:10CV55 |
| | ) |
| GRAMERCY PARK DESIGN, LLC | ) |
| (a/k/a "GRAMERCY PARK DESIGNS | ) |
| CO."), MIKE MOLTHAN, AUSTIN | ) |
| DEAN, HERMAN DEAN, RICK L. DUNN, | ) |
| SCOTT B. DUNN, STEPHEN L. EDGE, | ) |
| JOHN SHERGUR, JAMES R. VOSHALL, | ) |
| BILLY PITTMAN, CARY MARX, | ) |
| STEVE SCHIFRIN | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

OSTEEN, JR., DISTRICT JUDGE

On March 19, 2010, Plaintiff Campbell Sales Group, Inc.,
d/b/a Leather Italia USA (hereinafter "Leather Italia USA" or
"Plaintiff"), filed a Motion for Preliminary Injunction Against
All Defendants and an accompanying brief. (Docs. 18, 19.) On
May 14, 2010, Defendant Gramercy Park Design, LLC (a/k/a Gramercy
Park Designs Co.) (hereinafter "Defendant" or "Gramercy Park"),
and the individual defendants in the case (hereinafter
"Individual Defendants") filed responses to Plaintiff's motion.
(Docs. 43, 63.) Plaintiff filed a reply brief on June 14, 2010.
(Doc. 72.) The parties have filed various supporting affidavits
and declarations, and a hearing was held on September 13, 2010,

at which parties presented oral arguments on the motion. The motion is now ripe for consideration by this court, and for the reasons that follow, Plaintiff's motion is denied.

## I.  Background

Plaintiff is a leather furniture wholesale distributor located in Leland, North Carolina, and incorporated in the State of North Carolina.  Plaintiff's products include leather sofas, love seats, chairs, and ottomans.  In particular, Plaintiff produces the four leather furniture collections that are at issue in this case:  the Aspen, the Hanover, the Jensen, and the Parker.  These models were based on designs created specifically for Leather Italia USA by its Chinese manufacturer, Superb Creation Furniture Co. Ltd.[1]  (Campbell Decl. (Doc. 72 Ex. 1) ¶ 3.)  The Aspen and Jensen models have been on the market for approximately six years, the Hanover for approximately five years, and the Parker for approximately three years.

Defendant Gramercy Park is a furniture wholesale distributer organized in the State of North Carolina, with principal places

---

[1] Plaintiff alleges in its brief that the designs at issue "are original furniture designs that were created specifically for Leather Italia USA."  (Campbell Decl. (Doc. 72 Ex. 1) ¶ 3.)  In a declaration subsequently filed by Plaintiff, the managing director of Superb Creation states that Superb is in fact the exclusive licensee of these furniture designs, which were created by UK firm B2 Design, and that Plaintiff is the sole authorized distributor in the United States.  (On Decl. (Doc. 86) ¶¶ 2-3.)  Defendants have not challenged Plaintiff's standing to bring this suit, and this court notes the discrepancy but does not find that it affects the analysis set forth herein.

of business in Simpsonville, Kentucky, and Coral Springs, Florida.  Gramercy Park primarily focuses on leather furniture products and is a competitor of Leather Italia USA, both of which market their furniture throughout the United States.  Gramercy Park offers several different series of furniture, totaling approximately 150 models.  (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 3.)  Plaintiff claims that four of Gramercy Park's models are virtually identical "knock-offs" of Leather Italia USA models.  (First Am. Compl. (Doc. 25) ¶ 28.)  Specifically, Plaintiff alleges that Gramercy Park model number 5115 is a copy of Leather Italia USA's Aspen model, that Gramercy Park model number 5105 is a copy of Leather Italia USA's Hanover model, that Gramercy Park model number 5215 is a copy of Leather Italia USA's Jensen model, and that Gramercy Park model number 5140 is a copy of Leather Italia USA's Parker model.  (Id. ¶¶ 41-44.)

The Gramercy Park models are part of its 5000 series.  The design process for this series began in 2008, when Gramercy Park established a relationship with the Chinese manufacturer Kasen (also known as Kareno Manufacturing).  (Goldenberg Aff. (Doc. 57) ¶ 50.)  Gramercy Park contends that their designs were based on existing Kasen frames and were modified according to Gramercy Park's specifications.  (Id. ¶ 58.)  The design and development process for all models at issue in this case was underway or near completion by late February of 2009.  (Id. ¶ 59-65.)  Samples of

the 5105, 5215, and 5115 models were on display at the April 2009 High Point Furniture Market, as were pictures of the 5140 model. (<u>Id.</u> ¶ 69.)  Plaintiff apparently became aware of Gramercy Park's allegedly infringing models in the fall of 2009.  (First Am. Compl. (Doc. 25) ¶ 29-30.)

The Individual Defendants named in the Complaint are all former Leather Italia USA sales representatives.  In that capacity, they sold Leather Italia USA products to furniture retailers in their respective geographic areas.  The Individual Defendants were not employees of Leather Italia USA and did not sign employment, confidentiality, or non-compete agreements.  As independent sales representatives, the Individual Defendants also had relationships with and sold products on behalf of other furniture wholesalers and manufacturers.  Plaintiff claims that, as sales representatives, the Individual Defendants had access to confidential Leather Italia USA trade secrets and other information that they used to help Gramercy Park copy the Leather Italia USA designs and get them to market.  (First Am. Compl. (Doc. 25) ¶ 28.)  None of the Individual Defendants currently represent Leather Italia USA, and all except Austin Dean and Steve Schifrin have sold or currently sell furniture on behalf of Gramercy Park.  (Resp. Individual Defs. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 63) 4.)

Individual Defendant Mike Molthan was the first Individual Defendant to have a sales relationship with Gramercy Park, initially meeting with Gramercy Park president Glen Goldenberg in March 2009. (Molthan Aff. (Doc. 42) ¶ 16.) Molthan placed an order for furniture from Gramercy Park's 1000 series in May 2009. (Id. ¶¶ 16, 18.) The 1000 series does not include any of the models at issue in this case. In October 2009, Leather Italia USA announced that it would be requiring all its sales representatives nationwide to meet additional "performance and accountability standards." (First Am. Compl. (Doc. 25) ¶ 22.) Plaintiff claims that these new standards "did not sit well" with some of its sales representatives, including Defendant Mike Molthan. (Id.) Defendant Molthan, on the other hand, claims that he experienced delayed shipments, insufficient inventory, and quality issues with Leather Italia USA throughout his relationship with the company, and these issues continued through the summer and fall of 2009. (Molthan Aff. (Doc. 42) ¶¶ 21-22.) He decided to resign from his representation of Leather Italia USA and pick up the Gramercy Park 5000 series in December 2009. (Id. ¶ 23.)

The other Individual Defendants report that they had similar issues with Leather Italia USA's quality and inventory, and some also had issues with the terms of their sales commissions. (Resp. Individual Defs. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 63)

-5-

5.) These Individual Defendants began their sales relationships with Gramercy Park at various times between fall 2009 and January 2010. Some began carrying Gramercy Park products along with Leather Italia USA products, and some did not carry Gramercy Park lines until after their relationship with Leather Italia USA had ended. All of the Individual Defendants had resigned from representing Leather Italia USA or had been terminated by Leather Italia USA by January 2010. All deny being involved with the Gramercy Park design process, as well as having provided any confidential information or documents to Gramercy Park. (Id. at 4-5.) Plaintiff commenced this action on January 21, 2010, and now seeks a preliminary injunction "enjoining all defendants from selling all furniture products sold by Gramercy Park Design, LLC under the names TOPEKA TOBACCO [model 5140], PUEBLO COFFEE [model 5105], PUEBLO BORDEAUX [model 5115] and PUEBLO DESERT [model 5215]."[2] (Pl.'s Mot. Prelim. Inj. Against All Defs. (Doc. 18) 2.)

---

[2] Plaintiff also sought in its motion an injunction "enjoining all defendants from using all confidential Leather Italia USA documents and information as described in Leather Italia USA's supporting brief, and requiring the return of all such documents in defendants' possession, custody or control." (Pl.'s Mot. Prelim. Inj. Against All Defs. (Doc. 18) 2.) However, at the motion hearing, Plaintiff withdrew the motion as it relates to the trade secrets claim. This court will therefore consider the preliminary injunction motion with respect to the trade dress infringement claim only.

## II. Legal Standards

A preliminary injunction is an "extraordinary remedy afforded prior to trial" that temporarily provides "the relief that can be granted permanently after the trial." Real Truth About Obama, Inc. v. Fed. Elec. Comm'n, 575 F.3d 342, 345 (4th Cir. 2009). Prior to Real Truth About Obama, the Fourth Circuit applied a "balance-of-hardship test," the standard articulated in Blackwelder Furniture Co. of Statesville v. Seilig Manufacturing Co., 550 F.2d 189 (4th Cir. 1977), in determining whether to grant a preliminary injunction. Id. at 196; see also Real Truth About Obama, 575 F.3d at 346; Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359-60 (4th Cir. 1991). The balance-of-hardship test first required balancing the "'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant." Blackwelder, 550 F.2d at 195. If that imbalance tipped in favor of the plaintiff, the next step was to look at the merits of the case and determine whether the plaintiff had raised "grave or serious questions for litigation." Rum Creek Coal, 926 F.2d at 363. In Real Truth About Obama, the Fourth Circuit found that the Supreme Court's decision in Winter v. Natural Resources Defense Council, Inc., 555 U.S. ___, 129 S.Ct. 365 (2008), conflicted with the Blackwelder standard and that the test articulated in Winter is the standard to be applied going forward. Real Truth About Obama, 575 F.3d at 346. Under

the <u>Winter</u> standard, a plaintiff seeking a preliminary injunction must establish: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." <u>Id.</u> (<u>quoting</u> <u>Winter</u>, 129 S.Ct. at 374). All four requirements must be met. <u>Id.</u>

## III. Discussion

"'Trade dress' is a product's total image and overall appearance" and "may include features such as size, shape, color or color combinations, texture, graphics or particular sales techniques." <u>Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.</u>, 304 F.Supp.2d 726, 735 (D.Md. 2004) (<u>citing</u> <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 765 n.1 (1992)). Section 43(a) of the Lanham Act "creates a federal remedy against unfair competition in the form of a false designation of origin." <u>Devan Designs, Inc. v. Palliser Furniture Corp.</u>, No. 2:91CV00512, 1992 WL 511694, at *4 (M.D.N.C. Sept. 15, 1992), <u>aff'd</u> 998 F.2d 1008, 1993 WL 243677 (4th Cir. 1993) (unpublished table decision). This section, codified at 15 U.S.C. § 1125(a), provides in relevant part that:

> Any person who, or in connection with any goods or
> services, or any container for goods, uses in commerce
> any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of
> origin, false or misleading description of fact, or
> false or misleading representation of fact, which

> (A) is likely to cause confusion, or to cause
> mistake, or to deceive as to the affiliation,
> connection, or association of such person with
> another person, or as to the origin, sponsorship,
> or approval of his or her goods, services, or
> commercial activities by another person . . .

> shall be liable in a civil action by any person who
> believes that he or she is likely to be damaged by such
> act.

15 U.S.C. § 1125(a)(1)(A) (2006).

Plaintiff claims protected trade dress in the "total image and overall appearance of the sofa, love seat and chair and ottoman versions of its ASPEN, HANOVER, JENSEN, and PARKER designs." (First Am. Compl. (Doc. 25) ¶ 34.) The allegedly distinctive features of these designs are the "tier drop front facial arm panels and bustle back seating" in the Aspen design; the "scrolled arms, stitched seams in the back of the seats, and a slight camel back" in the Hanover design; the "scalloped front panel, faired front arm panels with inside welt trim and a reverse envelope arm" in the Jensen design; and the "bustle back seating, window pane stitching in the top back pillows, and a bow front appeal" in the Parker design. (Id. ¶¶ 35-38.) Plaintiff contends that Defendant Gramercy Park's sale of its 5105, 5115, 5140, and 5215 leather furniture models constitutes trade dress infringement and unfair competition. (Id. ¶ 46.) Plaintiff also alleges that the Individual Defendants are liable as independent sellers of the Gramercy Park models, or, alternatively, that the Individual Defendants are liable for

contributory infringement for providing confidential Leather
Italia USA documents that facilitated Defendant Gramercy Park's
infringing activity.  (Id. ¶¶ 47-48.)

    "To enjoin a competitor's use of a particular trade dress, a
plaintiff must show two things:  that his own trade dress has
acquired a secondary meaning and that there is a likelihood that
the defendant's use of that trade dress will confuse the public."
M. Kramer Mfg. Co. v. Andrews, 783 F.2d 421, 448-49 (4th Cir.
1986).  In an action for trade dress infringement where the trade
dress in question is not registered, the plaintiff also bears the
burden of proving that the matter for which he seeks protection
is not functional.  15 U.S.C. § 1125(a)(3).  Plaintiff claims
that the trade dress it seeks to protect is nonfunctional
"ornamental design" and that "[t]he unique overall appearance of
the Leather Italia USA designs is not essential to the use or
purpose of the article, nor does it affect the cost or quality of
the article."  (Br. Supp. Pl.'s Mot. Prelim. Inj. (Doc. 19) 11.)
Defendants do not presently dispute Plaintiff's contention that
the alleged trade dress is nonfunctional, and this court will
assume without deciding that Plaintiff has carried its burden in
establishing nonfunctionality.[3]

---

[3] As this matter is now before the court at a preliminary stage
of litigation, this fact-finding is limited to this order only.
This court is not presently finding that the features of
Plaintiff's products are protectable nonfunctional features as
opposed to properly copied aesthetic features in light of Wal-

**A.   Secondary Meaning**

In order to establish a likelihood of success on the merits,
Plaintiff must first show that its trade dress has acquired
secondary meaning.  Secondary meaning "occurs when, 'in the minds
of the public, the primary significance of a [mark] is to
identify the source of the product rather than the product
itself.'"  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S.
205, 211 (2000) (quoting Inwood Labs., Inc. v. Ives Labs., Inc.,
456 U.S. 844, 851 n.11 (1982)).  The Fourth Circuit applies a
presumption of secondary meaning in trade dress infringement
cases where defendant intentionally copied the plaintiff's trade
dress.  See M. Kramer, 783 F.2d at 448.  "[E]vidence of
intentional, direct copying establishes a prima facie case of
secondary meaning sufficient to shift the burden of persuasion to
the defendant on that issue . . . ."  Id.; see also Osem Food
Indus. Ltd. v. Sherwood Foods, Inc., 917 F.2d 161, 163 (4th Cir.
1990).  Plaintiff contends that there is sufficient evidence of
intentional copying to establish secondary meaning by operation
of the presumption.  (Pl.'s Br. Supp. Mot. Prelim. Inj. (Doc. 19)
9-10.)  Plaintiff further contends that, in the absence of the
presumption, secondary meaning is established by Plaintiff's
"substantial sales and advertising expenditures, coupled with the

------

Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205 (2000).

evidence of Gramercy Park's intentional and direct copying."
(Reply Br. Supp. Pl.'s Mot. Prelim. Inj. (Doc. 72) 7.)

The Fourth Circuit is in the minority of circuits to apply a presumption of secondary meaning in cases where there is evidence of intentional copying.[4] 2 <u>McCarthy on Trademarks and Unfair Competition</u> § 15:38 n.5 (4th ed. 2001) (citing cases in the Fourth and Sixth Circuits that applied the presumption). The rationale behind the presumption is that "[w]hen a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied." <u>Osem Food Indus.</u>, 917 F.2d at 165. Nevertheless, as another court in this district has previously noted, in product design cases "there may be an even more likely reason why one might copy another's trade dress[,] such as to capitalize on a particularly attractive or saleable product design." <u>Devan Designs</u>, 1992 WL 511694, at *11.

---

[4] The Fourth Circuit may in fact be the only circuit that currently applies such a presumption. Though <u>McCarthy</u> cites both Fourth and Sixth Circuit cases that have presumed secondary meaning based on evidence of intentional copying, it also notes a recent Sixth Circuit case that held such evidence is "relevant but not determinative," and "does not alone establish secondary meaning." 2 <u>McCarthy on Trademarks and Unfair Competition</u> § 15:38 n.5 (4th ed. 2001) (quoting <u>General Motors Corp. v. Lanard Toys, Inc.</u>, 468 F.3d 405, 419 (6th Cir. 2006)).

Defendants argue that the Supreme Court's decision in Wal-Mart has rendered the presumption inapplicable in product design cases. (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 12-14.) In Wal-Mart, the Court held that "in an action for infringement of unregistered trade dress under § 43 of the Lanham Act, a product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning." Wal-Mart, 529 U.S. at 216. As a result, plaintiffs may no longer prove infringement based upon a showing of the product design's "inherent distinctiveness." Id. at 213. Defendants therefore contend that "[i]f Plaintiff is allowed to end run the requirement of establishing secondary meaning by merely alleging intentional copying, then the Wal-Mart decision will effectively and practically be rendered meaningless." (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 14.) However, nothing in the language of the Wal-Mart decision expressly precludes such a presumption as one means of proving secondary meaning. At least one district court within the Fourth Circuit has considered a product design case in light of Wal-Mart and determined that the presumption still applies in product design as well as product packaging cases. See Leviton, 304 F.Supp.2d at 736-37 (stating that the Supreme Court's decision in Wal-Mart "did not cast doubt on M. Kramer's burden shifting approach"). In the absence of further guidance from the Fourth Circuit, this court finds that the

presumption of secondary meaning, as required by <u>M. Kramer</u>,[5] applies in product design cases where intentional copying is shown.

Plaintiff proffers as evidence of intentional copying the following facts:  the similarities between its designs and Defendant Gramercy Park's designs, as pictured in Exhibits 5-8 of the Complaint (First Am. Compl. (Doc. 25) ¶¶ 41-44); a Gramercy Park document showing the allegedly infringing models with handwritten notes listing the corresponding Leather Italia USA product for each model (Br. Supp. Pl.'s Mot. Prelim. Inj. (Doc. 19) at 10); the fact that Gramercy Park sent pictures and samples of Leather Italia USA models to its manufacturer in China for reference during the design process (Reply Br. Supp. Pl.'s Mot. Prelim. Inj. (Doc. 72) 2); and an email sent from Gramercy Park to its manufacturer regarding the Leather Italia USA models that it was shipping to the manufacturer "for copying."  (<u>Id.</u> at 2-4.)
 Defendant Gramercy Park has denied copying Plaintiff's designs, stating that the sofa models at issue were based on preexisting frames provided by its manufacturer.  (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 4; Goldenberg Aff. ¶ 51.)  Gramercy Park admits to providing Leather Italia USA photographs and samples to the manufacturer but contends they were strictly for purposes of

---

[5] Because Defendant has sufficiently rebutted the presumption of secondary meaning, as discussed below, this court reaches the same result whether or not the presumption applies.

-14-

quality comparison or as illustrations of particular features that Gramercy Park had requested as part of its frame modifications. (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 4; Goldenberg Aff. (Doc. 57) ¶¶ 56-57, 74-78.) Defendant claims that such comparisons are standard in the furniture industry (Goldenberg Aff. (Doc. 57) ¶¶ 73, 83); Plaintiff argues that they are not. (Campbell Decl. (Doc. 72 Ex. 1) ¶ 13.) Defendant also claims that it had no desire to "associate with or capitalize on the reputation or goodwill of Plaintiff," because "Gramercy Park has higher quality products and superior service than Plaintiff . . . ." (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 17.)

Because Defendant denies copying Plaintiff's designs, this case is distinguishable from a number of Fourth Circuit cases where the burden shifted following a defendant's admission of intentional copying. See, e.g., Larsen v. Terk Techs. Corp., 151 F.3d 140, 149 (4th Cir. 1998); Osem Food Indus., 917 F.2d at 163 n.4. The evidence of intentional copying here is certainly disputed, but, at this stage of the case, it is sufficient to give rise to the presumption of secondary meaning. See Leviton, 304 F.Supp.2d at 736-37. In particular, the email from Gramercy Park president Glen Goldenberg to Gramercy Park's manufacturer, which references "the sofas that we have shipped to you for copying" (Goldenberg Aff. (Doc. 57) Ex. 41 at 2), casts doubt on

Defendant's assertion that the models were being shipped merely for comfort and quality comparisons. This conclusion is less certain with respect to Gramercy Park model number 5215 (corresponding to the Leather Italia USA "Jensen" model), as there are significant aesthetic differences between the two models, and the Jensen was not one of the models shipped from Gramercy Park to its manufacturer in June 2009. (Goldenberg Aff. (Doc. 57) ¶ 78.) However, as Defendants are able to rebut the presumption of secondary meaning at this stage of the litigation, a more thorough examination of whether this particular model was intentionally copied is unnecessary.

By operation of the presumption, the burden of persuasion shifts to Defendant to show that secondary meaning does not exist. See M. Kramer, 783 F.2d at 448. Defendants contend that they have presented evidence sufficient to rebut a presumption of secondary meaning, both by presenting evidence and by the lack of persuasiveness of Plaintiff's evidence. See Retail Servs., Inc. v. Freebies Publ'g, 364 F.3d 535, 542-43 (4th Cir. 2004) (discussing presumptions in trademark case). To determine whether Defendants have rebutted the M. Kramer presumption, this court has reviewed the evidence in light of the factors necessary to establish secondary meaning, including: "1) advertising expenditures; 2) consumer studies linking the mark to a source; 3) sales success; 4) unsolicited media coverage of the product;

5) attempts to plagiarize the mark; and 6) the length and exclusivity of the mark's use." Int'l Bancorp, L.L.C. v. Societe des Baines de Mer et du Cercle des Etrangers a Monaco, 329 F.3d 359, 370 (4th Cir. 2003); see also Devan Designs, 1992 WL 511694, at *7. "These factors are merely tools to aid a court in assessing whether the relevant group of consumers made the requisite mental association between product and producer." Devan Designs, 1992 WL 511694, at *7.

Defendant Gramercy Park did not commission any consumer studies, noting the Devan Designs court's "disinclin[ation] to require every defendant who copies another's design to finance and obtain consumer surveys showing a lack of connection between product and producer in the eyes of the relevant public." (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 19 n.11 (citing Devan Designs, 1992 WL 511694, at *11).) Gramercy Park focuses its discussion on the sixth factor listed above: the length and exclusivity of use. With respect to the length of use, Plaintiff has been selling the "Jensen" and "Aspen" models for approximately six years; the "Hanover" model for approximately five years; and the "Parker" model for approximately three years. (Br. Supp. Pl.'s Mot. Prelim. Inj. (Doc. 19) 2.) Gramercy Park again cites Devan Designs for the proposition that "[w]here trade dress is alleged to consist of the product design, 'it will usually take longer, if it is possible at all, to acquire

secondary meaning." (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc.
43) 20 (citing Devan Designs, 1992 WL 511694, at *8).)
"[M]embers of the relevant consuming public must come to
associate the design of the furniture with a particular source."
Devan Designs, 1992 WL 511694 at *8. This association is
particularly difficult to cultivate when there are numerous
competing furniture models with similar designs and features,
which is why the exclusivity of use is also a consideration.

"It is extremely difficult for a seller to successfully
prove that a product or package design has achieved secondary
meaning when the design is a common one put on the market by
other sellers." 1 McCarthy on Trademarks and Unfair Competition
§ 8:11.50 (4th ed. 2001); see, e.g., EFS Mktg. v. Russ Berrie &
Co., 76 F.3d 487, 491 (2d Cir. 1996) ("EFS's dolls are so similar
to the many other troll dolls on the market that they cannot be
said to identify EFS as their particular source."). Defendant
Gramercy Park has come forward with numerous examples of
competing leather furniture models on the market that are similar
or nearly identical to the four Leather Italia USA models at
issue here. (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 21;
Goldenberg Aff. (Doc. 57) ¶¶ 8-34, Exs. 2-28.) Plaintiff
responds by arguing that "[a] trademark owner is not obligated to
deal with all infringers at the same time." (Reply Br. Supp.
Pl.'s Mot. Prelim. Inj. (Doc. 72) 9 (citing Checkpoint Systems,

<u>Inc. v. Check Point Software Techs., Inc.</u>, 104 F.Supp.2d 427, 459 (D.N.J. 2000)).)  However, the sheer number of similar designs on the market weighs heavily against a finding of secondary meaning for Plaintiff's designs.  Particularly noteworthy are two models manufactured by Superb Creation Furniture Co., Ltd., and sold under the name Futura Leather.  (Goldenberg Aff. (Doc. 57) ¶ 11, Exs. 4A, 4B.)  These models resemble Plaintiff's Hanover and Parker models and have many of the same elements that Plaintiff claims are distinctive features of the Leather Italia USA trade dress.  (<u>See</u> <u>id.</u>; First Am. Compl. (Doc. 25) ¶¶ 35-38.)  Futura Leather model number 9868 (Goldenberg Aff. (Doc. 57) Ex. 4A) features a slight camel back, stitched seams, and scrolled arms, all of which are described as distinctive features of Plaintiff's Hanover model (First Am. Compl. (Doc. 25) ¶ 36).  Futura Leather model number 6397 (Goldenberg Aff. (Doc. 57) Ex. 4C) features bustle-back seating, window-pane stitching in the top back pillows, and a bow front appeal, which Plaintiff identifies as the distinctive features of its Parker model (First Am. Compl. (Doc. 25) ¶ 38).  Superb Creation has manufactured Plaintiff's furniture in the past, and may at present, though this is unclear from the record.  (Goldenberg Aff. (Doc. 57) ¶ 11; Molthan Aff. (Doc. 42) ¶ 20; On Decl. (Doc. 86) ¶¶ 2-4.)  While Plaintiff is not obligated to pursue all infringers at once, it is significant that Plaintiff has not taken steps to prevent its own

manufacturer from producing and selling competing furniture designs that so closely resemble Plaintiff's.[6]

Advertising is another factor that Defendant Gramercy Park discusses in its brief, noting that "Plaintiff has not provided, nor is Gramercy Park aware of, any advertisements for or unsolicited media attention concerning its four models at issue in this case . . . ." (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 23.) Gramercy Park excepts from this statement an advertisement that appears on Costco's website for Leather Italia USA's "Parker" model, marketed on the website as the "Richfield Leather Collection." (Resp. Opp. Pl.'s Mot. Prelim. Inj. (Doc. 43) 23; Goldenberg Aff. (Doc. 57) ¶ 36, Ex. 29; Marx Aff. (Doc. 45) ¶ 16, Ex. A.) That Plaintiff allows Costco to market its products under the "Richfield Leather Collection" name undermines its claim that "distributors, retail sellers, and end purchasers have come to associate the Leather Italia USA designs as originating from Leather Italia USA."[7] (First Am. Compl. (Doc. 25) ¶ 32.) "Advertising a good as a product of alternating

_____

[6] Leather Italia USA president Michael Campbell acknowledges that Superb Creation sells furniture to retailers under its Future Leather brand, but he denies that the models highlighted by Defendant "are any of the Leather Italia USA designs." (Campbell Decl. (Doc. 72 Ex. 1) ¶ 5.)

[7] To the contrary, the sale of its products as the "Richfield Leather Collection" rebuts any presumption of secondary meaning, as Plaintiff's trade dress is not exclusive to the Plaintiff's name. Plaintiff's product is also associated with another name.

source diminishes its ability to achieve secondary meaning."
Devan Designs, 1992 WL 511694, at *7. The only mention of
Leather Italia USA in the Costco advertisement is a note in the
"Product Details" section that states: "Please email
pdunne@leatheritaliausa.com to receive a sample swatch."
(Goldenberg Aff. (Doc. 57) ¶ 36, Ex. 29; Marx Aff. (Doc. 45)
¶ 16, Ex. A.) This brief mention is not indicative of source,
nor is there anything else in the advertisement to indicate that
the furniture is made by Leather Italia USA. (Goldenberg Aff.
(Doc. 57) Ex. 29; Marx Aff. (Doc. 45) Ex. A.) In light of this
and all the other relevant factors, this court finds, for
purposes of this motion, that Defendant has successfully rebutted
the presumption of secondary meaning.

The additional evidence that Plaintiff proffers to support
its claim does not alter the conclusion that Plaintiff's trade
dress lacks secondary meaning. Plaintiff attempts to counter
Gramercy Park's argument concerning advertising by pointing to
advertising expenditures totaling $1,695,990 since 2005. (Reply
Br. Supp. Pl.'s Mot. Prelim. Inj. (Doc. 72) 7, Campbell Decl.
(Doc. 72 Ex. 1) ¶¶ 9-10, Exs. 2-4.) "Where advertising
expenditures are required to 'merely survive' in the competitive
market, advertising expenditures cannot be used to prove
secondary meaning. However, extensive advertising which results
in consumer association with a single source can establish

secondary meaning." <u>Burke-Parsons-Bowlby Corp. v. Appalachian</u>
<u>Log Homes, Inc.</u>, 871 F.2d 590, 596 (6th Cir. 1989) (citations
omitted). Plaintiff provides a chart that breaks down its
advertising expenditures into general categories, with items like
"Rent Showrooms" and "Catalogs, Swatches, Other." (Campbell
Decl. (Doc. 72 Ex. 1) Ex. 3.) However, it is not clear whether
the categories include more Leather Italia USA models than just
the four at issue in this case. The approximately $1.7 million
figure is therefore misleading if it includes the advertising
expenditures for all Leather Italia USA products. Furthermore,
Plaintiff's chart does not indicate whether these expenditures
were more than simply what was necessary to survive in the
furniture industry. <u>See</u> <u>Burke-Parsons-Bowlby</u>, 871 F.2d at 596
("Though BPB's advertising expenditures for the mark are
relevant, there is no evidence to establish the amount as
extensive or to distinguish it as beyond that necessary to
survive in the market . . . .") Additionally, "[e]vidence of
only the amount spent on advertising of the alleged mark is just
a part of the total picture. The nature, content and exposure of
publicity and advertising is needed to determine how compelling
is the logical inference that this advertising created a
secondary meaning." 2 <u>McCarthy on Trademarks and Unfair</u>
<u>Competition</u> § 15:52 (4th ed. 2001). Plaintiff provides by way of
example an advertisement featuring a picture of its "Jensen"

model (Campbell Decl. (Doc. 72 Ex. 1) Ex. 4), but a single advertisement does not constitute evidence of "extensive" advertising such that secondary meaning can be inferred.

Plaintiff also points to sales figures totaling $37,785,878.10 since 2005 as additional evidence of secondary meaning. (Campbell Decl. (Doc. 72 Ex. 1) Ex. 2.) Though "[t]he size of a company and its sales figures are relevant evidence from which to infer the existence of secondary meaning. . . ., [r]aw sales figures need to be put into context to have any meaning. 2 McCarthy on Trademarks and Unfair Competition § 15:49 (4th ed. 2001); see also Burke-Parsons-Bowlby, 871 F.2d at 596 ("Sales volume, though relevant, is not necessarily sufficient to indicate recognition of the mark by purchasers as an indication of the source.") Plaintiff's sales chart breaks down sales totals for each model by year, but it gives no information as to how those figures compare to industry norms, how they compare to sales of other Leather Italia USA models, or even what portion of Leather Italia USA's total sales these figures constitute. (Campbell Decl. (Doc. 72 Ex. 1) Ex. 2.) Ultimately, Plaintiff's additional evidence does not compel a finding of secondary meaning for the Leather Italia USA designs.

**B.   Likelihood of Confusion**

Absent a showing of secondary meaning, a plaintiff cannot establish a likelihood of confusion in a trade dress infringement case.  See Devan Designs, 1992 WL 511694, at *12 ("A buyer is not confused unless he is seeking a [product] with which he is familiar and mistakenly selects a product under the misconception that it is manufactured by or associated with the producer that he is looking for.").  Plaintiff's relationship with Costco undermines its contention that there is a likelihood of confusion with Defendant's products, just as it undermines the secondary meaning argument.  See discussion supra Part III.A.  By selling its product under a different name, Plaintiff introduces into the marketplace the very confusion that it complains of with regard to Gramercy Park's designs.

Defendants' evidence of the existence of a significant number of similar or nearly identical products is also compelling.  This evidence suggests that Plaintiff's trade dress at issue in this case is insufficient to prove a reasonable association of the trade dress with a particular manufacturer.  Thus, "the strength or distinctiveness of [Plaintiff's] mark," Pizzeria Uno Corp v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984), is insufficient to establish a likelihood of confusion.

As Plaintiff has not established a likelihood of success on the merits as to secondary meaning or a likelihood of confusion,

Plaintiff cannot make a clear showing under the first part of the Winter standard.[8]  It is not necessary to analyze the remaining parts of the Winter test, as Plaintiff must meet all four requirements in order to obtain a preliminary injunction.

**IV.  Conclusion**

For the foregoing reasons, Plaintiff's motion for preliminary injunction (Doc. 18) is **DENIED**.

This the 6th day of October 2010.

_William L. Osteen, Jr._
United States District Judge

---

[8] As noted earlier, the current findings are limited in effect to resolving Plaintiff's motion for a preliminary injunction. Discovery and full development of the record during further proceedings may lead to a different result, but Plaintiff's prospects on the merits are too speculative at this point to support preliminary relief.